UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ALEXANDER FRANCISCO,
     a/k/a "Javy,"
ARISTIDES RAMIREZ,
     a/k/a "AR," and
ALVIN EUSEBIO,
     a/k/a "Goo"

         *Defendants.*

22 Cr. 522 (GHW)

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Ashley C. Nicolas
Andrew W. Jones
Benjamin M. Burkett
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 1

ARGUMENT ........................................................................................................... 4

    I.      The Court Should Take Certain Measures to Protect the Testifying Undercover Officers ................................................................. 4

        A.     Relevant Facts ............................................................................... 4

        B.     Applicable Law .............................................................................. 5

        C.     The Government Should be Permitted to Withhold the True Names of the Active UCs (UC-1 and UC-2) ........................................ 7

        D.     The Active UCs Should Be Permitted to Testify with the Courtroom Closed ........................................................................ 13

        E.     The UCs Should Be Permitted to Testify Using a Pseudonym ................................................................................................. 18

    II.     The Court Should Admit Evidence of Some of Alvin EUSEBIO's Prior Firearms Possession, Drug Trafficking, and Related Convictions ........................................................................... 19

        A.     Relevant Facts ............................................................................. 19

        B.     Applicable Law ............................................................................ 21

        C.     Discussion ................................................................................... 24

CONCLUSION ....................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Ayala v. Speckard,*
 131 F.3d 62 (2d Cir. 1997) ................................................................ 6, 16, 17, 19

*Bowden v. Keane,*
 237 F.3d 125 (2d Cir. 2001) ........................................................................... 8

*Brown v. Artuz,*
 283 F.3d 492 (2d Cir. 2002) ........................................................................... 7

*Delaware v. Fensterer,*
 474 U.S. 15 (1985) ....................................................................................... 5

*Gonzalez v. Quinones,*
 211 F.3d 735 (2d Cir. 2000) ........................................................................ 7-8

*Oregon v. Kennedy,*
 456 U.S. 667 (1982) .................................................................................... 26

*Pennsylvania v. Ritchie,*
 480 U.S. 39 (1987) .................................................................................... 5, 6

*Pointer v. Texas,*
 380 U.S. 400 (1965) ..................................................................................... 5

*Presley v. Georgia,*
 130 S. Ct. 721 (2010) ............................................................................. 16, 15

*Press-Enterprise Co. v. Superior Court of California,*
 464 U.S. 504 (1984) .................................................................................... 16

*Roviaro v. United States,*
 353 U.S. 53 (1957) ....................................................................................... 7

*Smith v. Hollins,*
 448 F.3d 533 (2d Cir. 2006) ........................................................................... 7

*Smith v. State of Illinois,*
 390 U.S. 129 (1968) ................................................................................. 13, 14

*United States ex rel. Lloyd v. Vincent,*
 520 F.2d 1272 (2d Cir. 1975) ......................................................................... 6

*United States v. Alimehmeti,*
 284 F. Supp. 3d 477 (S.D.N.Y. 2018) ................................................... 18, 19, 20

ii

*United States v. Brand,*
467 F.3d 179 (2d Cir. 2006) ........................................................ 25

*United States v. Cabroni,*
204 F.3d 39 (2d Cir. 2000) .......................................................... 29

*United States v. Daly,*
842 F.2d 1380 (2d Cir. 1988) ................................................. 24-25

*United States v. Diaz,*
878 F.2d 608 (2d Cir. 1989) ........................................................ 26

*United States v. Figueroa,*
618 F.2d 934 (2d Cir. 1980) ........................................................ 27

*United States v. Gonzalez,*
110 F.3d 936 (2d Cir. 1997) ........................................................ 24

*United States v. Gupta,*
650 F.3d 863 (2d Cir. 2011) ........................................................ 15

*United States v. Herron, No. 10 Cr. 615*
(NGG), 2014 U.S. Dist. LEXIS 63872 (E.D.N.Y. May 8, 2014) .......................................... 27

*United States v. Jimenez,*
789 F.2d 167 (2d Cir. 1986) ........................................................ 26

*United States v. Kaiser,*
609 F.3d 556 (2d Cir. 2010) ................................................. 24, 29

*United States v. Martino,*
759 F.2d 998 (2d Cir. 1985) ........................................................ 26

*United States v. Mercado,*
573 F.3d 138 (2d Cir. 2009) ........................................................ 26

*United States v. Naseer, No. 10 Cr. 19*
(RJD), 2015 WL 13843166 (E.D.N.Y. Jan. 26, 2015) ................................................ 5, 6, 11

*United States v. Roldan-Zapata,*
916 F.2d 795 (2d Cir. 1990) ................................................. 25, 29

*United States v. Roopnarine,*
718 F. App'x 797 (11th Cir. 2017) ................................................. 12

*United States v. Saint Clair, No. 19 Cr. 790*
(PKC), 2022 WL 2256236 (S.D.N.Y. June 23, 2022) ........................................ 25

*United States v. Salameh,*
No. 93 Cr. 180, 1993 WL 168568 (S.D.N.Y. May 18, 1993) ................................... 6

*United States v. Teague*,
93 F.3d 81 (2d Cir. 1996) ..................................................................... 29

*United States v. Urena*,
8 F. Supp. 3d 568 (S.D.N.Y. 2014) .................................................... 11-12, 18, 20

*United States v. Vargas*,
702 F. Supp. 70 (S.D.N.Y. 1988) ......................................................... 27

*United States v. Zackson*,
12 F.3d 1178 (2d Cir. 1993) ................................................................ 26

*Waller v. Georgia*,
467 U.S. 39 (1984) ...................................................................... 16, 15

*Washington v. Walsh, No. 08 Civ. 6237*
(DAB), 2010 WL 423056 (S.D.N.Y. Feb. 5, 2010) ..................................... 11, 12

*Yung v. Walker*,
468 F.3d 169 (2d Cir. 2006) ............................................................... 20

## Statutes

18 U.S.C. § 924 ...........................................................................4, 28
21 U.S.C. §§ 846, 841 ...................................................................... 4

## Other

28 C.F.R. § 50.9 ............................................................................ 14
Fed. R. Evid. 403 ........................................................................26, 27
Fed. R. Evid. 404 ....................................................................24, 25, 26, 27, 29

## PRELIMINARY STATEMENT

The Government respectfully seeks *in limine* rulings on several issues prior to the trial of the defendants ALEXANDER FRANCISCO, a/k/a "Javy," ARISTIDES RAMIREZ, a/k/a "AR," and ALVIN EUSEBIO, a/k/a "Goo" (the "Defendants") which is scheduled to begin on November 4, 2024.

The Government requests several measures relating to the safety of the undercover officers expected to testify at trial. *First*, the Government requests that the Court permit the Government to withhold the true names of two active undercover New York Police Department ("NYPD") undercover officers ("UC-1" and "UC-2," and together the "Active "UCs") to whom the drug trafficking organization managed by the Defendants sold narcotics. *Second*, the Government requests an order closing the courtroom during the testimony of the Active UCs, except to the parties and the defendant's immediate family. *Third*, Government requests that the Court issue an order that the Active UCs and a third undercover law enforcement officer ("UC-3," and together with UC-1 and -2, the "UCs") to whom the Crew sold narcotics be permitted to testify under pseudonyms.

Additionally, the Court should admit certain evidence of defendant Alvin EUSEBIO's prior firearms possession, drug trafficking, and related convictions.

Finally, the Government respectfully requests leave to file supplemental motions as they become relevant in advance of trial.

## FACTUAL BACKGROUND

From at least in or about 2019 through at least in or about January 2024, the Defendants ran a drug trafficking organization (the "174th Street Crew," or the "Crew") between 174th and 175th Streets on Amsterdam Avenue in Manhattan (the "Set"). On the Set, the Crew conducted narcotics trafficking on the street and from multiple store fronts. The Crew also operated a stash

house from an apartment on West 174th Street. Until about September 2021, the 174th Street Crew also operated an illegal gambling operation within the confines of the Set, on Amsterdam Avenue. That gambling business, which the Crew referred to as the Bagel Shop, temporarily shut down after a patron was shot when leaving the Bagel Shop in September 2021. In or about August 2022, the Crew established a new Bagel Shop gambling operation at a barbershop near the intersection of Broadway and West 152nd Street.

The 174th Street Crew ran an organized, sophisticated narcotics trafficking operation that is best described as a street pharmacy. The Crew sold a variety of narcotics, both illicit and prescription, to its customers, including methamphetamine (which was marketed as ecstasy), cocaine, heroin, crack cocaine, fentanyl, oxycodone, Xanax, and marijuana. The Crew operated on the Set at all hours, and its members were assigned to work in designated shifts. Managers ensured that the Set was properly staffed for narcotics distribution and fined and disciplined members who missed work or demanded proof of illness (such as a doctor's note or a picture of a positive COVID test). Of the twenty-two defendants charged in this case, three are expected to proceed to trial: ALEXANDER FRANCISCO, a/k/a "Javy," ARISTIDES RAMIREZ, a/k/a "AR," and ALVIN EUSEBIO, a/k/a "Goo". The Defendants were all high-level managers of the Crew. Each of the Defendants was a principal leader of the Crew. RAMIREZ bore responsibility for the overall operation, including ensuring supply of pills. FRANCISCO was primarily responsible for the day shift while EUSEBIO was primarily responsible for the night shift.

Between February and December 2022, the NYPD conducted approximately two dozen undercover purchases of narcotics from the 174th Street Crew. Collectively during these transactions, the Crew sold the NYPD undercover officers more than 575 grams of methamphetamine, approximately 45 grams of oxycodone, and approximately four grams of

cocaine. Other undercover purchases from the Crew, in and about 2020, had resulted in additional seizures of fentanyl-laced heroin, oxycodone, and Xanax. Recordings from these undercover buys showed eight members selling directly to the UCs, including FRANCISCO. In addition to undercover purchases, the NYPD has seized large quantities of additional narcotics from the 174th Street Crew, including from the homes of RAMIREZ and FRANCISCO, as well as from cars occupied by members of the Crew, including EUSEBIO. The NYPD also seized quantities of narcotics from persons of, among others, EUSEBIO.

Members and managers of the 174th Street Crew carried and used firearms, including to protect the stash of narcotics belonging to the Crew. In December 2021 and August 2022, NYPD officers recovered handguns that were possessed by those holding stashes of narcotics on the Set. Specifically, the NYPD seized firearms from a bag worn by a member of the Crew while he sold drugs on the Set, as well as from cars occupied by members of the Crew, including EUSEBIO.

On July 18, 2024, a Grand Jury sitting in this District returned the sixth-superseding indictment in the case which charged the Defendants and five others, in Count One, with conspiring with others, from in or about 2019 through in or about January 2024, to distribute narcotics, specifically (i) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers; (ii) 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine; (iii) 1 kilogram and more of mixtures and substances containing a detectable amount of heroin; (iv) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl; and (v) mixtures and substances containing a detectable amount of oxycodone, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) and (b)(1)(C). In addition and as is relevant to the Defendants, Count Two charged FRANCISCO and others with the use, carrying, and possession of a firearm in

connection with a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2. Count Four charged RAMIREZ and EUSEBIO with the use, carrying, and possession of a firearm which was brandished and discharged in connection with a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii), and 2.

Trial is scheduled to begin on November 4, 2024.

## ARGUMENT

### I. The Court Should Take Certain Measures to Protect the Testifying Undercover Officers

The Government requests that the Court take three measures to protect the identities of the three undercover officers who are expected to testify at trial in order to ensure their safety as well as the integrity of ongoing investigations: allow the Government to withhold the names of the Active UCs, close the courtroom for the testimony of the Active UCs, and allow all of the UCs to testify pseudonymously.

#### A. Relevant Facts

Over the course of the investigation, three undercover officers purchased narcotics from several members of the Crew on approximately forty-two occasions, including from FRANCISCO on three occasions. Between in or about August 2022 and December 2022, UC-1 made five purchases of narcotics including methamphetamines and Oxycodone from the Crew. In addition, between in or about March 2022 and November 2022, UC-2 made sixteen purchases of narcotics including methamphetamines, cocaine and Oxycodone from the Crew. Finally, UC-3 made 21 purchases of narcotics including heroin, fentanyl, and oxycodone between in or about January 2020 and in or about February 2022. The majority of these narcotics transactions were audio- and video-recorded. As described in more detail below, UC-1 and -2 are active undercover officers

who are currently participating in ongoing investigations. UC-3 is no longer an active undercover officer but is still serving in the NYPD.

The Government anticipates calling the UCs as witnesses to testify about their participation in this investigation and each of these narcotics sales. The UCs are expected to testify, *inter alia*, about the recordings of each narcotics sale, their observations on the Set, specific narcotics that were sold to them during the sales, their subsequent transfer of these narcotics to other NYPD officers involved in the investigation, and their communications with members of the Crew at the time.

### B. Applicable Law

#### 1. The Confrontation Clause

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. *See Pointer v. Texas*, 380 U.S. 400, 85 (1965). The right of confrontation, however, "is not absolute." *United States v. Naseer*, No. 10 Cr. 19 (RJD), 2015 WL 13843166, at *2 (E.D.N.Y. Jan. 26, 2015) (citing *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). In appropriate circumstances, the right must "bow to accommodate other legitimate interests in the criminal trial process." *Id.* "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

Indeed, "the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987). "The ability to question adverse witnesses [], does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Id.* "Normally the right to confront one's accusers is

satisfied if defense counsel receives wide latitude at trial to question witnesses" and does not mandate cross-examination "in whatever way, and to whatever extent, the defense might wish." *Id.*

### 2. Witness Identity and Safety

Importantly, "[t]rial judges possess 'wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" *Naseer*, 2015 WL 13843166, at *2 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The Second Circuit has repeatedly recognized that protecting an undercover officer's safety and guarding against the threat to ongoing investigations from disclosure of an undercover officer's identity are substantial governmental interests. *See, e.g.*, *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) (recognizing the substantial interest in maintaining the effectiveness of an undercover officer); *United States ex rel. Lloyd v. Vincent*, 520 F.2d 1272, 1274 (2d Cir. 1975) (recognizing persuasive "interest of the state and of the witnesses in preserving the confidentiality of undercover agents"). As the Second Circuit has noted, "[t]he state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest." *Ayala*, 131 F.3d at 72.

Additionally, "it is well settled that a defendant is not necessarily entitled to discovery of [a witness's] identity." *United States v. Salameh*, No. 93 Cr. 0180, 1993 WL 168568, at *3 (S.D.N.Y. May 18, 1993). Simply put, "a defendant's right to know a witness's name and background is not without limit." *Naseer*, 2015 WL 13843166, at *3. This is true of both a defendant's ability to learn a witness's true identity as well as his ability to use that true name during questioning at trial.

In *Roviaro v. United States*, 353 U.S. 53, 77 (1957), which involved disclosure of the identity of a government informant, not an undercover officer, the Supreme Court explained that

"no fixed rule with respect to disclosure is justifiable." *Id.* at 62. Rather, the Court stated that "[t]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* The Court went on to explain that "[w]hether non-disclosure is erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.*

The Second Circuit has repeatedly held that prosecutors have an overriding interest in protecting the safety and efficacy of undercover officers. *See Smith v. Hollins*, 448 F.3d 533, 539 (2d Cir. 2006); *Brown v. Artuz*, 283 F.3d 492, 501-02 (2d Cir. 2002) (noting that the "safety of a police officer working undercover surely constitutes an overriding interest"); *Gonzalez v. Quinones*, 211 F.3d 735, 738 (2d Cir. 2000) (holding that courts "may properly order courtrooms closed during the testimony of undercover police officers, in order to protect both the officers' safety and their future effectiveness"); *see also Bowden v. Keane*, 237 F.3d 125 (2d Cir. 2001) (affirming denial of habeas where undercover testified in closed courtroom after articulating basis for fear of public testimony).

### C. The Government Should be Permitted to Withhold the True Names of the Active UCs (UC-1 and UC-2)

The Government requests that it be permitted to withhold the true names of two active NYPD undercover officers who participated in the investigation and who are expected to testify at trial, as revealing the true identities of the Active UCs will create serious risks to the safety of the Active UCs and their families. Such disclosure will also threaten the viability of ongoing criminal investigations. Moreover, based on the below described diligence that will be performed by the Government, maintaining the confidentiality of the Active UCs' true names will in no way prejudice the defense. The Government therefore respectfully requests that the Court issue an

order that the Government shall not be required to disclose the Active UCs' true names. As discussed further herein, UC-3 no longer serves in an undercover capacity but is still employed by the NYPD. The Government intends to disclose UC-3's true identity on an Attorneys' Eyes Only basis.

In this case, balancing the interests of the Defendants in effectively cross-examining the Active UCs with the very serious public safety concerns that arise from disclosing the true identities of the Active UCs necessitates an order permitting the Government to withhold the true identities of the Active UCs. The Government intends to submit, under separate cover, a declaration from NYPD Chief of Detectives Kenny's declaration ("Kenny Decl."), which will set forth numerous justifications exist for why the UCs' true name should remain confidential. By contrast the Government intends to disclose, an on an attorneys eyes only basis, the identify of UC-3—who is no longer actively engaging in undercover law enforcement—in recognition that the potential harms to officer safety and ongoing investigations is highest for the Active UCs.

*First*, disclosure of the true identities of the Active UCs would pose grave risks to the safety of the Active UCs and their families. As a general matter (and as the Government expects will be described in detail in Chief of Detectives Kenny's Declaration), UCs put themselves in extreme risk every day. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ Were the Active UCs to be recognized by the targets of their current or past investigations

or those targets' criminal associates, the Active UCs' safety and lives would be in grave danger. Many of those targets, as well as RAMIREZ and EUSEBIO, along with their associates, have criminal histories that include firearms offenses as well as violence. Those individuals may seek to injure or kill the Active UCs and have the means to do so.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

These examples amply demonstrate that once information is shared, the NYPD has no way of controlling its widespread disclosure to the public even when protections are put in place.

*Second,* disclosure of the Active UCs' true identities would compromise their ongoing investigations. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ ██ ████████████████████████████████

[REDACTED] Disclosing their true identities (which inevitably would lead to discovery of their addresses, telephone numbers, email addresses, and family members), would risk outing the Active UCs and potentially ending these ongoing law enforcement operations.

Thus, the significant government interest in protecting ongoing investigations, ensuring the safety of the Active UCs, who risk their lives every day, and enabling the Active UCs to continue the important work they do for the City necessitates protecting their true identities. *See, e.g.*, *Cotto v. Fischer*, No. 09 Civ. 9813, 2012 WL 5500575 (SAS) (MHD), at *31-36 (S.D.N.Y. Aug. 23, 2012) (noting the safety threats and dangers posed to undercovers and the need to protect their real identities), *report and recommendation adopted*, 2012 WL 5499890 (S.D.N.Y. Nov. 12, 2012); *Washington v. Walsh*, No. 08 Civ. 6237 (DAB), 2010 WL 423056, at *7 (S.D.N.Y. Feb. 5, 2010) (approving of withholding the true identities of undercover officers where "[b]oth were still pursuing undercover work in close proximity to the buy-and-bust operation that led to [the defendant's] arrest; both had been threatened during their respective careers and were aware of threats to fellow officers; both participated in cases with 'lost subjects' who were never arrested

and still at large; and both regularly took precautions to keep their true identities a secret"); *Naseer*, 2015 WL 13843166, at *3 (describing that when "safety concerns are balanced against the defendant's ability to conduct meaningful cross-examination, the scale tips in the favor of maintaining secrecy of the witnesses' names").

This is especially true under the circumstances here, where the true names of the Active UCs have no specific relevance to the case or to the Active UCs' credibility or their knowledge regarding the topics they will testify about. *See, e.g.*, *United States v. Urena*, 8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) ("UC-188's true name is immaterial to defendants' guilt or innocence. The Defendants will have access to all *Giglio* material associated with UC-188's true name, and will be able to freely cross-examine him on all topics other than his identity. Moreover, nothing about UC-188's real name goes to his credibility or knowledge regarding the subject of his testimony. The limitation imposed on the defense is therefore negligible."). And, of course, nearly all of the sixteen and five transactions in which UC-1 and -2, respectively, purchased drugs from the Crew were captured on video and audio recordings. Accordingly, the characters and backgrounds of the Active UCs are inherently less important to the defense at trial.

The Seventh Circuit considered this issue in *United States v. Roopnarine*, 718 F. App'x 797, 808 (11th Cir. 2017). There, the district court "permitted the government's undercover witness to testify without disclosing his real name" to the defendant, despite the defendant's request for the information. *Id.* at 809. The Seventh Circuit explained that the defendant was not prejudiced because "[p]rejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them." *Id.* (citing *Alford v. United States*, 282 U.S. 687, 692 (1931)). Because there was no allegation that the lack of obtaining the Active UC's identity prevented the

defendant from "effectively plac[ing] a witness in the proper setting" before the jury," the Court

found no harm." *Id.* To the contrary, the Court stated that even without the identity information,

"the record reflect[ed] a thorough cross-examination." *Id.*

Similarly, *Washington v. Walsh*, 2010 WL 423056, a case from this District, is also on

point. In *Walsh*, the defendant argued in his habeas petition that the trial court violated his

confrontation right "by refusing to permit even a limited, *in camera*, disclosure of the undercover

witnesses' true names to defense counsel only." *Id.* at *1. After explaining that the Conformation

Clause did not "establish a blanket rule" requiring the disclosure of undercover officers' names,

Judge Batts explained that the trial court properly "balanced the concerns over the safety of the

undercover detectives against [the defendant's] need for their names and concluded that the

restriction was appropriate."[1] *Id.* at *7. Specifically, the court stated that unlike with government

informants, "the detectives' biases, if any, were apparent because they were law enforcement

officers." *Id.* The same is true here.

Likewise analogous is *United States v. Donovan*, No. 20 Cr. 374 (PKC) (E.D.N.Y. Dec.

21, 2021). In *Donovan*, the court initially ordered the Government "to provide defense counsel

_____

[1] The *Walsh* court also rejected arguments made pursuant to *Smith v. State of Illinois*, 390 U.S. 129, 132 (1968). In *Smith*, the identity of a government informant, not a undercover officer, was at issue. There, the court stated that "when the credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives." *Id.* at 131 (citation omitted). *Smith*, however, is inapposite because such questions regarding undercovers' identity and addresses are obviously irrelevant and inadmissible at this trial. In addition, undercover officers are differently situated from government informants because they are employed by law enforcement agencies who keep track of their employment information, disciplinary record, and criminal history—information that has been disclosed to the defendant. Unlike with undercover officers, the motivation for a government informant to provide information to law enforcement officers may be relevant to the defense because it could establish bias.

12

with names of the relevant undercover officers, which defense counsel may share only with their investigator, who, in turn, shall not reveal this information to anyone." (*Id.*, Dec. 21, 2021 Dkt. Entry.) The Government moved for reconsideration of the court's order on the basis that "disclosure of the UCs' true identities would jeopardize ongoing investigations and pose a serious risk of danger to the UCs and their families." (*Id.*, Dkt. No. 91, at 1.) The Government attached a declaration of the NYPD Chief of Detectives in support of its motion for reconsideration. After reviewing the Government's motion and the supporting declaration from the Chief of Detectives, the court "reconsidered its previous order, and permitted the Government not to disclose the UCs' names, given that the Government ha[d] already provided a detailed *Giglio* disclosure to the defense, and because of the significant safety issues articulated in the Government's motion and supporting declaration." (*Id.*, Dec. 21, 2021 Dkt. Entry).

The Government is in the process of conducting its routine *Giglio* checks on the Active UCs (as well as UC-3). At the appropriate time, the Government will disclose any incidents of misconduct requiring disclosure. An investigator from the United States Attorney's Office will also conduct both law enforcement and open-source searches of the UCs' real names. Therefore, it is difficult to imagine any purpose that defense counsel would have to require the Active UCs' names in preparation for cross-examination. On balance the Government interest in protecting the lives of the Active UCs and their families, as well as in preserving the integrity of ongoing investigations, far outweighs the interest of the Defendants in learning the true names of the Active UCs, where those names have little, if any, relevance to the anticipated testimony.

### D. The Active UCs Should Be Permitted to Testify with the Courtroom Closed

The Government requests that the Court issue an order that the Active UCs be permitted to testify with the courtroom closed, except to the parties and the Defendants' immediate family,

during testimony of the Active UCs.[2]  This measure, along with allowing the Government to withhold the true identities of the Active UCs and to allow the UCs to testify under pseudonyms (*see supra*), are necessary to protect the UCs' life, physical safety, and the integrity of ongoing as well as future investigations.

## 1.  Applicable Law

While the Sixth Amendment guarantees every person accused in a criminal prosecution the right to a "public" trial, the closure of a criminal trial courtroom may constitutionally occur under limited circumstances.  *Waller v. Georgia*, 467 U.S. 39, 43 (1984); *see also Presley v. Georgia*, 130 S. Ct. 721, 723-24 (2010).  The United States Supreme Court set forth the standards for courtroom closure in a four-factor test:

> (1)   the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,
>
> (2)   the closure must be no broader than necessary to protect that interest,
>
> (3)   the trial court must consider reasonable alternatives to closing the proceeding, and
>
> (4)   it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 43; *see also United States v. Gupta*, 650 F.3d 863, 866 (2d Cir. 2011).  The Second Circuit, in evaluating this standard in the context of a state criminal prosecution, opined:

> It may be doubted whether trial judges can make meaningful distinctions between "compelling" and "overriding" interests or can distinguish between whether such interests are "likely to be prejudiced" or whether there is a "substantial probability of" prejudice. We believe the sensible course is for the trial judge to recognize that open trials are strongly favored, to require persuasive evidence of serious risk to an important interest in ordering any closure, and to realize that the more extensive is the closure requested, the

---

[2] The Government is seeking authorization from the Deputy Attorney General pursuant to 28 C.F.R. § 50.9 to seek closure for the testimony of the UCs.

> greater must be the gravity of the required interest and the likelihood of risk to that interest.

*Ayala v. Speckard*, 131 F.3d 62, 70 (2d Cir. 1997).[3]

### 2. Discussion

Measured against the governing constitutional standard, the appropriateness of closing the courtroom for the Active UCs' testimony is clear. There can be no question that the Government has a strong interest in protecting the safety of the Active UCs—indeed, the very lives of the UCs in maintaining the continued effectiveness of their ongoing undercover work "is an extremely substantial interest" and that "this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom." *Ayala*, 131 F.3d at 72. For all the reasons descried above, the risk that anyone in the courtroom might recognize the Active UCs and reveal their identities to others creates unacceptable risks. Indeed, the Second Circuit has emphasized that there is "no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity." *Id.* The risk to both the Active UCs and their work are especially pronounced here where the Active UCs continue to conduct undercover operations in several ongoing investigations in northern Manhattan involving individuals with violent histories,

███████████████████████████████████████████████████████████

██████████

---

[3] The public also has a First Amendment right to open access to public trials. *See, e.g., Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 504, 505-07 (1984). The Supreme Court has indicated that the *Waller* test satisfies the requirements of the First Amendment as well, however, as "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller*, 467 U.S. at 46; *see also Presley*, 130 S. Ct. at 724 (2010) ("[T]here is no legitimate reason, at least in the context of juror selection proceedings, to give one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has.").

The Government understands that when undercover NYPD officers—including the UCs—testify in New York State Supreme Court, courtrooms are often closed to address similar risks to testifying UCs in state investigations. Courts in this District have also closed the courtroom under such circumstances. *See e.g.*, *United States v. Mial*, S2 21 Cr. 499 (PAE); *United States v. Esteves*, S1 20 Cr. 686 (JGK); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 490 (S.D.N.Y. 2018); *United States v. Urena*, 8 F. Supp. 3d 568, 572 (S.D.N.Y. 2014); *United States v. Felton*, S14 17 Cr. 21 (WHP) (Doc. No. 357); *United States v. Sharpe, et al.*, S4 15 Cr. 288 (RMB); *United States v. Allen*, S8 15 Cr. 95 (AJN).

While the requested closure will unquestionably deprive the public of the opportunity to see the witness, the Defendants will suffer no deprivation whatsoever, as they will be able to observe the Active UCs throughout the entirety of the testimony, including for any cross-examination. The Government recognizes that it must accept the risk that the Defendants will describe the Active UCs to other criminal cohorts; however, the Second Circuit has nonetheless recognized that "the right to a public trial does not require the further risk that the officer's identity will become known through observation by members of the public who might enter the courtroom and see the officer testifying." *Ayala*, 131 F.3d 72. In addition, as the transcript of the proceeding would be made available to the public shortly after the testimony is given, and a live audio feed from another courtroom could also be provided, the deprivation to the public pales in comparison to the Government's interest in shielding the identities of the Active UCs from the public in order to protect the Active UCs, their families, and their undercover work.

Although open public hearings and trials serve many important democratic values, the adverse effect of the requested limited closure is minimal and in no way prejudices the Defendants. The same cannot be said of alternative means that would serve the purpose of protecting the Active

UCs, such as having the officer testify either in disguise or behind a screen. Indeed, the Second Circuit in *Ayala* addressed these alternatives and found that the alternatives themselves pose "substantial risks to a fair trial for the defendant," including an impact on the fact-finder's ability "to observe the witness's demeanor and assess credibility." *Ayala*, 131 F.3d 71-72; *see also Alimehmeti*, 284 F. Supp. 3d at 487-89.

Accordingly, the appropriate way to protect the Government's substantial interests, while minimizing any prejudice to the defendant and the public, is to allow the closure of the courtroom while the Active UCs testify. Based on the facts of the instant case, the proposed courtroom closure is "no broader than necessary" to protect the Active UCs' safety and the integrity of ongoing investigations. *Urena*, 8 F. Supp. 3d at 571; *see also Alimehmeti*, 284 F. Supp. 3d at 487. The Government is unaware of any reasonable alternative that will protect these vital interests.

Should the Government's request be granted, the Government would work to provide additional accommodations in the interests of transparency, which would further minimize any prejudice to the Defendants or the public. *First*, the Government would make the daily transcript of the Active UCs' testimony available to the public through the court reporter's office. *Second*, the Government would agree to permit each defendant's immediate family to be present for the testimony of the Active UCs.[4] *Third*, the Government would request the Court make a live audio

---

[4] There is some authority in the Second Circuit indicating that a higher showing must be made to exclude defendants' families from a criminal proceeding than any other member of the general public. *See, e.g., Yung v. Walker*, 468 F.3d 169, 175 (2d Cir. 2006) ("*Waller's* . . . mandate that the closure be no broader than required to protect the overriding interest at stake necessarily applies . . . to the portion of the public to be excluded. Thus, *Waller* prevents a court from denying a family member's request to be exempted from a courtroom closure order unless the court is convinced that the exclusion of that particular relative is necessary to protect the overriding interest at stake."). While the Government is not currently aware of any narcotics trafficking activities amongst the defendants' families, should the Government learn new information relating to the

feed of the Active UCs' testimony available in another courtroom where, to the extent technologically possible, exhibits and recordings played during the Active UCs' testimony will be made available.[5]

### E. The UCs Should Be Permitted to Testify Using a Pseudonym

For many of the same reasons that the Government is seeking an order permitting it to withhold the true names of the Active UCs, the Government also seeks an order allowing the three UCs to testify at trial using pseudonyms. As described more fully above and in Exhibit A, the risk of the Active UCs being recognized in the course of their undercover work, leading to violent harm and potentially death, is a grave concern. The same is true of UC-3 who continues to work as an NYPD officer. Public disclosure of the UCs' name would heighten this risk by allowing the Defendants, their associates, and anyone else who is aware of this prosecution to research, locate, and retaliate against the UCs or their families.[6] These risks are even greater given the availability of nearly everyone's personal information on the internet. As discussed above, the Active UCs continue to work undercover, including in the general area targeted in this case and UC-3 continues to work in the community, routinely exposing himself to very real threats to safety albeit in an overt capacity.

---

defendants' families and their possible involvement with narcotics trafficking, the Government will move to exclude those individuals from the courtroom.

[5] In one prior case where the Court granted a request for court closure, it permitted one member of the press to attend the otherwise closed session "so as to assure press exposure to visual observations . . . that only a person physically present in the court can make," provided the member of the press pool will respect the Government's "vital interest" in protecting the UCs' identity. *Alimehmeti*, 248 F. Supp. 3d at 487.

[6] As described above, the Government intends to disclose the name of UC-3 to defense counsel on an attorneys' eyes only basis.

As noted above, the Government intends to disclose any *Giglio* information the Government learns about the UCs (although at present the Government is aware of none)—including any *Giglio* information the Government derives from its knowledge of the UCs' true legal names. Accordingly, there will be no prejudice to the Defendants created by the use of pseudonyms at trial.

## II. The Court Should Admit Evidence of Some of Alvin EUSEBIO's Prior Firearms Possession, Drug Trafficking, and Related Convictions

The Government seeks to admit evidence that (1) on or about March 14, 2022, in Miami, Florida, Alvin EUSEBIO possessed a handgun, approximately 9.5 grams of oxycodone, and approximately 4.5 grams of cocaine, and (2) on or about September 18, 2018, Alvin EUSEBIO possessed heroin and crack and traveled from Washington Heights to Elkton, Maryland with his co-conspirator and co-defendant Reginald MCCLURE, and EUSEBIO and MCCLURE arrived in Maryland at MCCLURE's residence where additional narcotics and firearms were stored. The Government also seeks to admit evidence of the EUSEBIO's criminal convictions for both incidents.

### A. Relevant Facts

At trial, the Government expects to introduce evidence that shows Alvin EUSEBIO was responsible for running the 174th Street Crew's operations during the hours of approximately 2:00 AM to 9:00 AM, which was referred to as the "night shift." In running the night shift, EUSEBIO had the authority to hire workers, fire workers, and discipline workers, including by instituting fines. EUSEBIO and others on the night shift carried firearms, and EUSEBIO directed the conspirators he controlled to use violence and threats to control the Crew's territory.

One of the people EUSEBIO hired to help run the night shift was REGINALD MCCLURE, a/k/a "Red." MCCLURE served as EUSEBIO's deputy and was responsible for assisting

EUSEBIO in running the night shift. EUSEBIO and MCCLURE had a history of trafficking drugs together, including that in September 2018 they were arrested together in Maryland and charged with trafficking various narcotics. On or about September 18, 2018, Maryland State Police officers were conducting electronic surveillance of a black Infiniti that was used by MCCLURE. Prior investigation had shown that MCCLURE had traveled to New York multiple times and made short stops before returning to Maryland. On September 18, 2018, the Infiniti traveled to the area of 173rd Street and 174th Street in Washington Heights, where it stopped for about an hour before heading back south.

When the Infiniti arrived back at MCCLURE's home in Elkton, Maryland, the Maryland State Police stopped the car. Inside the car were MCCLURE and EUSEBIO. MCCLURE possessed a plastic bag of crack cocaine, and EUSEBIO possessed a plastic bag of heroin. A search of MCCLURE's home revealed additional heroin, fentanyl, and multiple firearms, and EUSEBIO and MCCLURE were charged with various drug trafficking crimes. EUSEBIO later pleaded guilty to possession with intent to distribute heroin and MCCLURE pleaded guilty to possession with intent to distribute cocaine. EUSEBIO was released from prison for this offense in February 2019. MCCLURE was released in March 2020. After he was released from prison, EUSEBIO continued trafficking narcotics in Washington Heights at 174th Street. At some point after MCCLURE was released from prison, EUSEBIO hired MCCLURE to help manage the night shift.

At times during the conspiracy, EUSEBIO relocated from New York to South Florida. EUSEBIO did this, for among other reasons, because he was aware that he was wanted for arrest in New York. While EUSEBIO was in Florida, MCCLURE and others ran the operations of the night shift, but EUSEBIO remained involved. From Florida, EUSEBIO communicated with the members of the night shift and had his co-conspirators send drugs to Florida for EUSEBIO to sell.

Also from Florida, EUSEBIO directed workers in the 174th Street Crew to make deliveries of large quantities of narcotics to EUSEBIO's customers in New York.

On March 14, 2022, shortly after one of the shipments of narcotics was sent from the 174th Street Crew night shift to Florida, EUSEBIO was arrested in Miami with a handgun, approximately 9.5 grams of oxycodone, and approximately 4.5 grams of cocaine. After being charged by the state, EUSEBIO fled back to New York. He was later indicted federally in the Southern District of Florida and charged with being a felon in possession of a firearm. EUSEBIO was arrested in New York in October 2022 and transferred to Florida for the federal prosecution. In February 2023 he pleaded guilty to the felon in possession of a firearm offense. In April 2023 he was sentenced to 37 months' imprisonment for that offense and then transferred to this District to face prosecution in this case.

### B. Applicable Law

#### 1. Direct Evidence

Evidence of an uncharged act is admissible as direct evidence, without regard to Rule 404(b), if the uncharged act "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *see also United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (explaining that some kinds of evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "direct proof of the charged conspiracy"); *accord United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be

admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

### 2. 404(b)

Evidence of a defendant's prior acts is admissible under Rules 404(b) and 403 if it (1) is advanced for a proper purpose; (2) is relevant to a material issue at trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) is admitted subject to a limiting instruction, if one is requested. *United States v. Brand*, 467 F.3d 179, 196 (2d Cir. 2006). Permissible purposes for introducing evidence of other acts include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Other-act evidence can also be admissible "to inform the jury of the background of the conspiracy charged," "to complete the story of the crimes charged," and to "help[ ] explain to the jury how the illegal relationship between [participants in the crime] developed." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (internal citations omitted) (alterations in original).

"Courts in this Circuit apply an 'inclusionary approach' with respect to Rule 404(b), whereby prior act evidence 'is admissible for any purpose other than to show a defendant's criminal propensity.'" *United States v. Saint Clair*, No. 19 Cr. 790 (PKC), 2022 WL 2256236, at *5 (S.D.N.Y. June 23, 2022) (quoting *Roldan-Zapata*, 916 F.2d at 804). The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion. *See, e.g.*, *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009). Even prior bad acts that are remote in time may be admissible under Rule 404(b) if they are relevant and adequately probative to help a jury shed light on the issues before it. *See United States v. Martino,* 759 F.2d 998, 1005 (2d Cir. 1985) (admitting eleven-year-old conviction under Rule 404(b)).

Where evidence is offered for a proper purpose under Rule 404(b), the Court may only exclude the evidence under Rule 403 if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993). As the Second Circuit has explained:

> To be sure, *all* evidence incriminating a defendant is, in one sense of the term, "prejudicial" to him: that is, it does harm to him. In that sense, the more pertinent evidence is, the more prejudicial it is. What "prejudice" as used in Rule 403 means is that the admission is, as the rule itself literally requires, "unfair" rather than "harmful."

*United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986); *see United States v. Diaz*, 878 F.2d 608, 615 (2d Cir. 1989); *see also Oregon v. Kennedy*, 456 U.S. 667, 674 (1982) ("Every act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt[.]"). With regard to the prejudice prong, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Moreover, Rule 403 does not bar evidence of other bad acts that "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged." *Roldan-Zapata*, 916 F.2d at 804.

All relevant evidence is to some degree prejudicial; *unfair* prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Comm. Note. Traditional examples of unfair prejudice include evidence that appeals to the jury's sympathies, evidence that arouses jurors' sense of horror, and evidence that provokes a jury's instinct to punish. *See United States v. Herron*, No. 10 Cr. 615 (NGG), 2014 U.S. Dist. LEXIS 63872, at *13-14 (E.D.N.Y. May 8, 2014). Thus, when opposing the admission of evidence under Rule 404(b), a "[d]efendant must show some

undue prejudice, apart from the prejudice implicit in Rule 404(b) evidence." *United States v. Vargas*, 702 F. Supp. 70, 72-73 (S.D.N.Y. 1988).

## C. Discussion

### 1. EUSEBIO's Conduct and Conviction in Florida are Direct Evidence in this Case

As described above, in March 2022, EUSEBIO was in Florida but remained involved in the charged conspiracy. While in Florida, EUSEBIO continued to direct his workers in New York to deliver narcotics to EUSEBIO's customers in New York. And while in Florida, EUSEBIO had his workers in New York ship narcotics to Florida that EUSEBIO could then distribute in Florida. That EUSEBIO remained an active participant in the conspiracy while he was in Florida is further shown by the fact that when he ran from the Florida authorities, EUSEBIO returned to New York and resumed his in-person management of the night shift.

Because EUSEBIO remained an active participant in the charged conspiracy who was receiving distribution-quantities of narcotics in Florida, evidence of his possession of narcotics and a handgun in Florida in March 2022 should be admitted as direct evidence in this case.

The Court should also admit evidence of EUSEBIO's conviction in the Florida case. EUSEBIO's conviction records, which include the judgment and a factual stipulation EUSEBIO signed are direct proof of EUSEBIO's firearm possession, which is directly relevant in the 18 U.S.C. § 924(c) offense in which he is charged. Moreover, the introduction of evidence of the conviction in that case would not unduly prejudice EUSEBIO because that conviction, which was for simple possession of a firearm "did not involve conduct any more sensational or disturbing than the crimes with which" EUSEBIO is now charged, which include drug trafficking, and carrying, using, brandishing, and discharging a firearm in furtherance of drug trafficking. *Roldan-Zapata*, 916 F.2d at 804.

### 2. EUSEBIO's Conduct and Conviction in Maryland are Direct Evidence in this Case

In September 2018, EUSEBIO traveled with Reginald MCCLURE from the area around 173rd Street and 174th Street in Manhattan to Maryland. When they arrived in Maryland, EUSEBIO and MCCLURE were arrested with drugs on them, just outside of MCCLURE's stash house. This distribution of narcotics from around the area of 174th Street is direct evidence of the charged narcotics distribution conspiracy, notwithstanding the fact that it happened approximately three-and-a-half months before the beginning time frame alleged in the indictment. *United States v. Teague*, 93 F.3d 81, 84 (2d Cir. 1996) ("[A]n indictment date only needs to be substantially similar to the date established at trial.").

Even if the Court were to conclude that the September 2018 conduct is too early in time to be considered part of the charged conspiracy, that incident, coupled with the fact that following their releases from Maryland prison in 2019 and 2020, EUSEBIO and MCCLURE returned to 174th Street and continued trafficking narcotics together and with the broader 174th Street Crew, "is inextricably intertwined with the evidence regarding the charged offense," and is nevertheless still direct evidence of the charged narcotics trafficking conspiracy. *Kaiser*, 609 F.3d at 570. The evidence of EUSEBIO's September 2018 drug trafficking is also direct evidence of the charged offense because in that incident EUSEBIO trafficked narcotics from 174th Street to Maryland, which is part of the same "series of transactions as the charged offense," which involves a 174th Street-based drug trafficking organization. *United States v. Cabroni*, 204 F.3d 39, 44 (2d Cir. 2000).

### 3. EUSEBIO's Conduct and Conviction in Maryland Should be Admitted under Rule 404(b)

Even if not admitted as direct evidence, the Court should still admit evidence of EUSEBIO's Maryland drug trafficking and conviction under Rule 404(b). Following the Second

Circuit's "inclusionary approach," evidence is admissible pursuant to Rule 404(b) to, among other things, "help explain to the jury how the illegal relationship between participants in the crime developed." *Roldan-Zapata*, 916 F.2d at 804. This rule permits the introduction of evidence of a "pre-existing drug-trafficking relationship between" conspirators to help "the jury's understanding of how the instant transaction came about and their role in it." *Id.*

Here, the evidence of EUSEBIO's prior drug-trafficking relationship with MCCLURE would help the jury understand the relationship between the two conspirators, including providing an explanation for how and why MCCLURE later acted as EUSEBIO's deputy in running the night shift.

Whether admitted as direct evidence or other acts evidence, evidence of EUSEBIO's drug trafficking conviction in Maryland, including records of his and MCCLURE's guilty pleas and judgments, should also be admitted. EUSEBIO's admission that he was trafficking heroin and conviction for doing the same is directly relevant in the current case, and like his Florida conduct, this conduct and conviction, "did not involve conduct any more sensational or disturbing than the crimes with which" EUSEBIO is now charged, and therefore its introduction would not be unduly prejudicial to him. *Roldan-Zapata*, 916 F.2d at 804.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

DATED:        September 25, 2024
                New York, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  */s/*                       
Ashley C. Nicolas
Andrew W. Jones
Benjamin M. Burkett
Assistant United States Attorneys
(212) 637- 2467 / -2249 / -2455