```
                                                    ┌─────────────────────────────┐
                                                    │ USDC SDNY                   │
                                                    │ DOCUMENT                    │
                                                    │ ELECTRONICALLY FILED        │
UNITED STATES DISTRICT COURT                        │ DOC #: _____    │
SOUTHERN DISTRICT OF NEW YORK                       │ DATE FILED: 3/24/2025       │
------------------------------------------------ X  └─────────────────────────────┘
                                                 :
UNITED STATES,                                   :
                                                 :
                                                 :
                                                 :
                  -v-                            :
                                                 :         1:22-cr-522-GHW-5
                                                 :
                                                 :
ALVIN EUSEBIO,                                   :         MEMORANDUM
                                                 :         OPINION & ORDER
                                   Defendant.    :
                                                 :
------------------------------------------------ X
```

GREGORY H. WOODS, United States District Judge:

On November 15, 2024, a jury convicted Alvin Eusebio of two offenses—conspiracy to distribute narcotics and possession of a firearm in furtherance of the narcotics conspiracy. The defendant has moved pursuant to Federal Rule of Criminal Procedure 29 to vacate the portion of the jury's verdict that found that the conspiracy involved the distribution of 500 grams or more of methamphetamine. Because Mr. Eusebio's leadership role in the conspiracy is not sufficient by itself to establish that he "directly and personally" participated in drug sales by other members of the conspiracy, and because the evidence presented at trial did not establish that Mr. Eusebio knew or could reasonably have foreseen that pills marketed by the conspirators as ecstasy or "E pills" were, in fact, methamphetamine, the motion to vacate that portion of the jury's findings is GRANTED.

I. **PROCEDURAL HISTORY**

On January 25, 2023, Alvin Eusebio was charged in a two-count indictment with participation in a conspiracy to distribute illegal narcotics and possession of a firearm in furtherance of the alleged drug trafficking conspiracy. Dkt. No. 22 (S1 1:22-cr-522 Superseding Indictment). As the case progressed toward trial, the Government filed a sixth superseding indictment. Dkt. No. 393

(S6 1:22-cr-522 Superseding Indictment or the "Superseding Indictment"). The Superseding Indictment charged that Mr. Eusebio participated in a long-running conspiracy to distribute illegal narcotics in violation of 21 U.S.C. § 846. The Superseding Indictment also charged that Mr. Eusebio possessed a firearm in furtherance of that conspiracy, and that he brandished and discharged a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(i), (ii), and (iii) and 2.

Trial began on November 4, 2024. The Court charged the jury on November 14, 2025. In its instructions, the Court instructed the jury regarding how it should determine the quantity of each of the narcotics involved in the conspiracy:

> In making your determination about the quantity of the substance involved in the conspiracy charged in Count One, you should consider the substance that was involved in any act or acts in which the defendant personally and directly participated. In making this determination, you should also include any other substance involved in the conspiracy so long as the quantity of the substance was either known to the defendant or was reasonably foreseeable to him, and was within the scope of the criminal activity that he jointly undertook. "Reasonably foreseeable" means that the defendant could have reasonably anticipated the quantity of each controlled substance involved in the conspiracy.

Trial Transcript ("Tr.") at 1320:11-22. The parties did not object to the instruction.

On November 15, 2025, the jury returned its verdict. The jury found the defendant guilty of participating in a conspiracy that involved the distribution of a broad array of illegal drugs, including cocaine, heroin, fentanyl, oxycodone and methamphetamine in violation of 21 U.S.C. § 846. Dkt. No. 596. The jury also found the defendant guilty of possession of a firearm in furtherance of the drug trafficking conspiracy, in violation of 18 U.S.C. § 924(c). *Id.*

The jury was asked to make special findings regarding the quantity of narcotics involved in the offense. The jury found that the conspiracy involved the distribution of 500 grams or more of methamphetamine. *Id.* That finding triggered a mandatory minimum sentence pursuant to 21 U.S.C. 841(b)(1)(A). That was the only finding by the jury of a quantity of narcotics that would mandate the imposition of a minimum sentence.

The defendant filed this motion for partial acquittal on December 2, 2024. Dkt. No. 617 (notice of motion); Dkt. No. 618 ("D. Mem."). In his motion, the defendant challenged only the jury's determination that the conspiracy involved at least 500 grams of methamphetamine. The argument centered on a single asserted flaw in the Government's case: "Every single gram of methamphetamine introduced by the government . . . had a single distinguishing characteristic: it appeared in the form of counterfeit ecstasy pills (hereinafter, 'E Pills')." D. Mem. at 1. All of the E Pills seized and tested by the Government tested positive for the presence of methamphetamine. But what was absent from the Government's proof, the defendant argued, was evidence that Mr. Eusebio or the other members of the conspiracy "*understood* that the E Pills were in fact methamphetamine," rather than ecstasy, as the conspirators marketed the pills. *Id.* As a result, the defendant contended, the evidence did not support the conclusion that he had the requisite knowledge that the drugs being sold were methamphetamine. *Id.* at 4–10.

In his motion, the defendant acknowledged that the evidence established that he was involved in the sale of 6.7 grams of E Pills, which were seized from his person during one arrest.[1] *Id.* at 5. Because he was "directly and personally" involved in the sale of those pills, the defendant accepted that the Government need not prove that he knew that the E Pills were in fact methamphetamine. But he argued that the evidence did not establish that Mr. Eusebio knew that E Pills sold by other members of the conspiracy were methamphetamine. *Id.* at 6.

The Government filed its opposition on December 16, 2024. Dkt. No. 641 ("Opp."). In its opposition, the Government first argued that the "trial record is replete with evidence showing the defendant's personal and direct participation in the Crew's drug trafficking." *Id.* at 16.

---

[1] The arrest that led to the seizure of these E Pills was the subject of an earlier opinion by the Court. *See United States v. Eusebio*, 2024 WL 4215742 (S.D.N.Y. Sep. 17, 2024).

3

The Government then argued that because Mr. Eusebio was a leader within the conspiracy, he was "directly and personally" involved in all of the sales of narcotics by the conspirators who he managed. The Government asserted that "the proof of his significant role as a leader of the Crew demonstrated his responsibility for the Crew's wholesale distribution of methamphetamine . . . ." *Id.* at 17. In the Government's view, as a "leader and organizer" of the group of traffickers, Mr. Eusebio was "directly and personally" involved in all of the sales by his underlings. *Id.* at 20–21 ("Because the trial evidence . . . showed the defendant's repeated, personal, and direct involvement in the night shift's drug sales, . . . the Government was not required to show that he knew the Crew was trafficking methamphetamine as opposed to some other controlled substance . . . ."). Therefore, the Government asserted, it need not prove that the quantity or type of drugs sold by his co-conspirators was reasonably foreseeable to him.

The Government also argued that the jury could find that the defendant could reasonably foresee that the conspiracy would involve the distribution of more than 500 grams of methamphetamine. *Id.* at 23. The Government relied on the testimony of its expert witness, Inspector Alfred Hernandez, as the basis for its argument that the jury could conclude that the defendant knew that E Pills contained methamphetamine. *Id.* at 26. The Government argued:

> At trial, Inspector Hernandez provided expert testimony that drug traffickers commonly sell methamphetamine, instead of ecstasy or MDMA, because methamphetamine is significantly cheaper than MDMA. Coupled with the evidence that the defendant and the Crew mis-marketed the methamphetamine they were selling as MDMA or prescription drugs, and the fact that the defendant was a senior leader of the conspiracy who profited from the sales of drugs on the block that went beyond those hand-to-hand transactions he conducted, a reasonable jury would have no problem finding that, at a minimum, the defendant could reasonably foresee that the so-called "E-pills" he was acquiring, distributing, and selling, in fact contained the cheaper ingredient methamphetamine. This is because as someone reaping the profits of the drug trafficking operation and supplying subordinates, the defendant was in a unique position to understand the costs, sale prices, and profit margins of the drugs he and his subordinates were selling and therefore understand (or at a minimum reasonably expect) that he and his crew were selling methamphetamine, rather than MDMA.

4

*Id.* at 26–27.

Mr. Eusebio filed his reply on December 23, 2024. Dkt. No. 656 ("Reply"). In it Mr. Eusebio re-emphasized the foundation of his argument: "all the seized methamphetamine came in the form of E Pills, nearly all of those E Pills came from the Crew's day shift, and there was no evidence that anyone in the 174 Street Crew understood those E Pills to be methamphetamine." Reply at 1. The defendant argued that, as a result, there was insufficient evidence for the jury to conclude that it was reasonably foreseeable to Mr. Eusebio that the conspirators were selling methamphetamine. Because Mr. Eusebio only "directly and personally" participated in the sale of the small quantity of E Pills seized from his person, the defendant argued, the jury's special verdict cannot be upheld.

## II.  THE EVIDENCE AT TRIAL

At trial, the United States established that the defendant was a leader of a prolific drug trafficking organization. The organization operated principally in Washington Heights between West 174th and West 175th Streets and Amsterdam and Audubon Avenues, which is how it got its moniker: the 174th Street Crew. Members of the organization sold enormous quantities of drugs working in shifts through the night and day. A cooperating witness, who had been recruited to join the organization by Mr. Eusebio, testified that Mr. Eusebio, together with two of his co-defendants, was in charge of the 174th Street Crew "overall." Tr. at 310:24-25.

In particular, Mr. Eusebio ran the crew's night shift, which operated from 2:00 a.m. to 9:00 a.m. Tr. at 326:1-3. The night shift sold prescription pills, cocaine, crack cocaine, heroin, fentanyl, and what they marketed as ecstasy or "E Pills." *Id.* at 309:16-17.[2] Mr. Eusebio worked

---

[2] The cooperating witness testified that the "organization" sold an array of drugs, including ecstasy. Tr. at 309:16-17. The Court accepts that it is a reasonable inference that the night shift sold that full array of drugs. However, the Court observes that when asked what drugs the night shift sold, the cooperating witness responded: "Percocets, cocaine, crack, and heroin." *Id.* at 329:8. The witness did not testify that he sold E Pills. *Id.* at 343:10-17. The cooperating

5

with Reginald "Red" McClure to organize the night shift's operations. Tr. at 311:3-4; 326:4-5. Either Mr. Eusebio or Red gave the night shift workers their supply of drugs for sale for the night. At the end of the shift, the workers returned their remaining supply of drugs to Mr. Eusebio or Red, together with the profits from their sales. *Id.* at 331:3-7; 392:9-15. The cooperating witness sent drug counts to Mr. Eusebio regarding how many pills he had received by text message. None of those pill counts included E Pills—instead, they referred to Percocet, oxycodone and cocaine. *Id.* at 334:10-337:15.

In a November 29, 2021 text message exchange introduced into evidence, the cooperating witness asked Mr. Eusebio to send him "jipper"—another code word for ecstasy pills—and Mr. Eusebio responded "Copy"—meaning that he would send E Pills to the witness. Tr. at 374:19-375:2; GX 804C-15. No information was contained in that thread regarding the quantity of E Pills that Mr. Eusebio sent to the witness.

The evidence showed that Mr. Eusebio was a careful manager: he imposed fines on workers who were late for their shifts, *id.* at 347:4-9, and threatened to "bench" workers who were not performing up to snuff. *Id.* at 349:18-24.

During the course of the extensive investigation of the 174th Street Crew, the New York City Police Department (the "NYPD") seized large quantities of narcotics. A relatively small fraction of those seizures came from the night shift, and only one of those involved methamphetamine: on December 8, 2021, members of the night shift were sitting in a car making sales. *Id.* at 362:7-8; GX617A. The cooperating witness testified that the two other co-conspirators in the car with him had Percocet pills, crack and heroin. *Id.* at 362:9-10. They had a gun as well. *Id.* at 362:11-18. NYPD officers approached the car and the co-conspirators fled. *Id.* at 363:4-12. The car was later

---

witness testified that he provided the proceeds of sales at times to Mr. Eusebio. Tr. at 344:1-4. However, the witness's testimony did not establish that he sold E Pills.

6

searched by the police. Tr. at 483:4-488:19. They found many bags of cocaine and crack, 200 glassines with a mixture of heroin and fentanyl, many oxycodone pills and 76 tablets containing approximately 32 grams of methamphetamine. *Id.*; GX 317, 517, 1002.[3] In its brief, the Government characterizes the night of December 8, 2021, as "an otherwise ordinary evening for the Crew," Opp. at 4, to support an argument that the quantity of methamphetamine seized that night was typical of the night shift's sales. However, no evidence was introduced to benchmark that night, or the amount or type of drugs seized, as typical.

In addition to managing the supply of the night shift's drugs, the defendant personally sold drugs. A cooperating witness testified about Mr. Eusebio's participation in sales in Washington Heights. The witness described one night in which the night shift "hit a record," selling more pills than any other shift. *Id.* at 351:7-25. They accomplished that goal because Mr. Eusebio and others "did a lot of overtime." *Id.* The witness did not testify about the type of pills sold that night—in particular whether they included E Pills. Mr. Eusebio also coordinated deliveries of drugs to people who did not come to the Heights to buy their drugs, as exemplified by a delivery to a customer identified as Kobi Frankel in midtown Manhattan, which was arranged by text message. Tr. at 353:18-354:17; GX 804B-4A.

Mr. Eusebio was arrested twice during the course of the conspiracy. The first arrest occurred on May 22, 2020 on 174th Street between Amsterdam and Audubon Avenues. Tr. at 55:14-18. Mr. Eusebio was found to be carrying an array of drugs, including cocaine, oxycodone, and 13 tablets containing more than 6.7 grams of methamphetamine.[4]

---

[3] This is the only seizure from the night shift identified by the Government.
[4] The NYPD arrested another man together with Mr. Eusebio. That person too was carrying drugs, including tablets containing more than 16.4 grams of methamphetamine. In its opposition, the Government describes that man as the defendant's "co-conspirator." Opp. at 11. But the Government introduced no evidence at trial establishing that the man was Mr. Eusebio's co-conspirator. Nor was he named as a defendant in the wide-ranging indictment in this case.

The second arrest occurred on March 14, 2022 in Miami, Florida. When he was arrested, Mr. Eusebio was carrying a firearm. He was also carrying 50 peach-colored pills, bearing the markings of Adderall, and 16 white pills bearing the markings of oxycodone. The Government did not introduce evidence at trial regarding the chemical composition of those pills. However, the cooperating witness testified that he had helped the defendant's girlfriend bring him "hundreds or thousands" of pills consisting of "Percocets and ecstasy pills." Tr. at 395:24-397:1; 443:13-14.

At trial, the Government introduced into evidence 1,978 methamphetamine tablets that were seized from members of the 174th Street Crew, including the 13 tablets seized from Mr. Eusebio, and the 32 grams seized from the night shift's stash. Nearly all of the methamphetamine tablets were either sold to undercover officers by members of the Crew's day shift or were seized pursuant to an arrest. Others were seized from locations that the Crew used to store drugs. Of the 1,978 pills introduced into evidence, 764 were tested by the NYPD's laboratory—all of them tested positive for methamphetamine.

However, none of the members of the conspiracy testified that they knew that the pills contained methamphetamine. Instead, the pills found to contain methamphetamine were mis-marketed as ecstasy or E Pills. The communications by members of the conspiracy referred to the pills as such or using another code word for ecstasy. No evidence was presented at trial about how or from whom the members of the conspiracy obtained their E Pills.

As a result, the only evidence introduced at trial that might support the conclusion that any member of the Crew knew or reasonably foresaw that the ecstasy or E Pills that they were selling was actually methamphetamine was the testimony of Inspector Hernandez. The relevant portion of his testimony is excerpted below.

> Q. I want to shift gears slightly here and talk about methamphetamine. What forms is methamphetamine typically sold in?

8

>    A. It's sold in either the crystalline powder in either what we -- or in crystal meth, which is basically -- it looks like chards of glass, ice. It's a form of methamphetamine that's purer and people smoke. And it's pressed into pills either to replicate or counterfeit certain pharmaceutical pills or to replicate and counterfeit ecstasy pills. Ecstasy pills are E pills, are pills that usually contain MDMA, methylenedioxymethamphetamine. But drug traffickers will use methamphetamines because it's a large cheaper than MDMA.
>
>    Q. And when it's sold in that pill form, are there any terms that are used on the street to refer to those pills?
>
>    A. E pills or X or ecstasy pills, if it's being counterfeited, if the meth pills are being counterfeited into ecstasy pills and being sold as MDMA.
>
>    Q. Just in general terms, what does the appearance of those meth pills or E pills typically look like?
>
>    A. Oh, they are very colorful pills. They come in all shapes. They have animations on them, writing. A lot of them use marketing ploys; they'll shape them into or have images related to cartoons or movies that people are acquainted with and, as I said, come in different forms and color.

Tr. at 924:1-25.

### III.   DISCUSSION

#### A.   Legal Standard

##### i.   Rule 29 Motion for Acquittal

Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The test for sufficiency is "whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (internal quotation and citation omitted). To prevail in a Rule 29 motion, a defendant must show, "considering all of the evidence, direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). "In other words, a court may grant a judgment of acquittal only if the evidence that the defendant committed

9

the crime alleged was nonexistent or . . . meager." *Jackson*, 335 F.3d at 180 (internal quotations and citation omitted).

When evaluating a Rule 29 motion, a court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)). Where there are competing inferences to be drawn from the evidence, the court must "defer 'to the jury's choice.'" *Eppolito*, 543 F.3d at 45. The court's deference to the jury's findings is "especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court . . . ." *Id.* at 46 (quoting *Jackson*, 335 F.3d at 180). In short, the defendant bringing a Rule 29 motion "bears a heavy burden." *Coplan*, 703 F.3d at 62 (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)).

"Applying this standard does not, however, mean that a reviewing court must affirm all jury verdicts." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). A court must also be mindful of its responsibility to protect a defendant's rights under the Fifth Amendment. If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could reasonably find guilt beyond a reasonable doubt." *Id.* at 515 (alteration in original) (quoting *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014)). In particular, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt

and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."

*Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

### ii. Scienter Requirement Regarding Drug Type and Quantity Under 18 U.S.C. § 846

Mr. Eusebio was convicted of a violation of 21 U.S.C. § 846—which charged him with engaging in a conspiracy to violate 21 U.S.C. § 841. "And § 841(b) of that title prescribes maximum and minimum punishments depending on the type and quantity of the controlled substance involved in the offense." *United States v. Andino*, 627 F.3d 41, 45 (2d Cir. 2010). One of those mandatory minimum punishments is at issue in this case, in particular 21 U.S.C. § 841(b)(1)(A)(viii), which states:

> (b) Penalties
>
> Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
>
> (1)(A) In the case of a violation of subsection (a) of this section involving—
> . . .
> (viii) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;
>
> such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life . . . , a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $10,000,000 if the defendant is an individual . . . . If any person commits such a violation after a prior conviction for a serious drug felony or serious violent felony has become final, such person shall be sentenced to a term of imprisonment of not less than 15 years and not more than life imprisonment . . . , a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $20,000,000 if the defendant is an individual or $75,000,000 if the defendant is other than an individual, or both. If any person commits a violation of this subparagraph or of section 849, 859, 860, or 861 of this title after 2 or more prior convictions for a serious drug felony or serious violent felony have become final, such person shall be sentenced to a term of imprisonment of not less than 25 years and fined in accordance with the preceding sentence.

21 U.S.C § 841(b).

The jury must determine whether the offense involved the required amount of drugs, and the government must prove that fact beyond a reasonable doubt. *See generally Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). To establish a direct violation of 21 U.S.C. § 841, "the government does not have to prove that the defendant knew the specific nature and amount of the controlled substance for the enhancement provisions to apply." *Andino*, 627 F.3d at 45 (quoting *United States v. Collado–Gomez*, 834 F.2d 280, 280–81 (2d Cir. 1987)).

The *mens rea* requirement is different, however, when a defendant is charged pursuant to 21 U.S.C. § 846 with conspiracy to violate 21 U.S.C. § 841. As a general matter, "in a conspiracy punishable under 21 U.S.C. § 841(b)(1)(A), the government must also prove . . . that it was either known or reasonably foreseeable to the defendant that the conspiracy involved the drug type and quantity charged" *United States v. Santos*, 541 F.3d 63, 70–71 (2d Cir. 2008) (citing *United States v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006)).

However, "[u]nder 21 U.S.C. § 846, the government need not prove foreseeability of drug type and quantity to the extent that it seeks to hold a defendant accountable for drug transactions in which the defendant directly and personally took part." *Andino*, 627 F.3d at 45. "In cases . . . where the defendant personally and directly participated in the drug transaction underlying the conspiracy charge, the government need not prove that the defendant had knowledge of either drug type or quantity." *Id.*

### B. Analysis

In order to prove that the conspiracy involved 500 grams or more of mixtures and substances containing methamphetamine, the Government had to prove either that the quantity and type of drugs was known or reasonably foreseeable to Mr. Eusebio *or* that he directly and personally participated in the sale of that quantity of methamphetamine. The Government's evidence was insufficient to prove either proposition to a rational jury beyond a reasonable doubt.

12

### i. Lack of Evidence of Knowledge or Foreseeability That "E Pills" Were Methamphetamine

The Government failed to prove that Mr. Eusebio—or any member of the conspiracy—knew or reasonably would foresee that the pills that they sold as ecstasy or "E Pills" were, in fact, methamphetamine. The evidence presented at trial supported the conclusion that the conspirators sold substantial quantities of E Pills. All of the E Pills that were tested by the NYPD tested positive for methamphetamine. However, no direct evidence was presented at trial that any member of the conspiracy was aware, or reasonably would have foreseen, that the pills that they sold as ecstasy were, instead, a different drug—methamphetamine. No testimony of any person involved in the offense or any communication by a conspirator indicated that the conspirators were aware that the drug that they were marketing as ecstasy was methamphetamine.

The only evidence presented by the Government on this point was the testimony of Inspector Hernandez. His testimony does not support a finding that Mr. Eusebio knew or reasonably foresaw that pills sold by his co-conspirators were methamphetamine rather than ecstasy. At the outset, Inspector Hernandez testified that "Ecstasy pills are E pills, are pills that *usually* contain MDMA, methylenedioxymethamphetamine." Tr. at 924:10-11 (emphasis added). The Court expects that a rational jury would understand the word "usually" in accordance with its common meaning, which is "according to the usual or ordinary course of things : most often : as a rule" *Usually*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/usually (last visited March 19, 2025). This testimony does not support a determination beyond a reasonable doubt that Mr. Eusebio could reasonably expect that the E Pills were instead methamphetamine—it contradicts that conclusion: "usually" E Pills are ecstasy.

The remainder of Inspector Hernandez's testimony does not bear the weight that the Government's case requires. After saying that E Pills are usually ecstasy, he said the following: "But drug traffickers will use methamphetamines because it's a large cheaper than

13

MDMA." Tr. at 924:12-13. There are two principal reasons why this testimony does not adequately support a finding beyond a reasonable doubt that Mr. Eusebio knew or reasonably foresaw that any E Pills that the conspirators sold was instead methamphetamine. First, the testimony does not support the inference that the co-conspirators knew or had reason to know that the pills that they had acquired were methamphetamine. Inspector Hernandez testified that drug traffickers use methamphetamine because it is cheaper, but he did not say that street level drug dealers—like the conspirators in this case—as opposed to the manufacturers of the pills would have any reason to know that the supply that they acquired contained methamphetamine. And the Government did not present evidence at trial that Mr. Eusebio had knowledge of the means by which the E Pills sold by the conspirators were manufactured.[5] There was no testimony or evidence regarding the source of the conspirators' supply of E Pills.[6]

Second, the testimony does not support the inference that all E Pills sold by drug traffickers are methamphetamine. A rational jury could not draw an inference from the statement that "drug traffickers will use methamphetamines," that all drug traffickers do so at all times. Inspector Hernandez had just testified that E Pills "usually" are ecstasy. A rational jury would understand his testimony that drug traffickers "will use methamphetamine" to mean that they sometimes do so— not that they always do. Inspector Hernandez's testimony does not support the finding beyond a reasonable doubt that Mr. Eusebio knew that the E Pills sold by the conspiracy were methamphetamine, because the testimony says nothing about the knowledge of street level drug sellers regarding the composition of the pills. Because the testimony establishes that usually E Pills

---

[5] The Government introduced evidence showing that Mr. Eusebio was involved in the procurement of prescription pills, see, e.g., Tr. at 345:18-25.
[6] No evidence was presented at trial that might support the inference that the conspirators were aware that the pills that they were selling was not ecstasy, such as evidence that the E Pills acquired and sold by the conspirators were acquired at a price lower than that of E Pills actually made of ecstasy.

14

sold are ecstasy, it does not support the inference that a dealer like Mr. Eusebio would have reason to foresee that any E Pills sold by the conspirators were composed of a different drug.

There was ample evidence at trial that established that Mr. Eusebio was a leader of the 174th Street Crew, who would have insight into the scope of the conspiracy's operations, including its sale of E Pills. From the evidence presented at trial, a rational jury could infer that he had knowledge of the scope of the conspiracy's operations. But the Government failed to produce sufficient evidence to establish beyond a reasonable doubt that Mr. Eusebio—or any other member of the conspiracy—was aware of the fact that, or would reasonably foresee that, the drugs that were being sold to customers as ecstasy or E Pills were instead methamphetamine.

### ii. Lack of Evidence That Mr. Eusebio "Directly and Personally" Participated in the Sale of 500 Grams of Methamphetamine

The evidence presented at trial does not support a finding that Mr. Eusebio "directly and personally" participated in the sale of 500 grams and more of methamphetamine. The evidence established that Mr. Eusebio directly and personally participated in the sale of the 6.7 grams of methamphetamine that he was carrying when he was arrested on May 22, 2020.

But no rational jury could find beyond a reasonable doubt that he was "directly and personally" involved in the sale of the quantity of methamphetamine found by the jury. "[T]he government must introduce specific evidence of drug quantities, or evidence from which quantity can, through inference, be logically approximated or extrapolated. In the absence of such evidence, a jury's finding as to drug quantity is nothing but 'surmise and conjecture.'" *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) (internal citations omitted). The Government did not introduce sufficient evidence to permit the jury to support a finding that the defendant directly and personally trafficked in 500 plus grams of methamphetamine by anything but surmise.

The evidence established that, in addition to his management role, Mr. Eusebio personally sold drugs as part of the crew. As noted above, a cooperating witness testified that Mr. Eusebio

15

worked "overtime" making sales and that the night shift hit a record of sales on one evening. *Id.* at 351:7-25. The witness did not testify that any of the pills sold were E Pills, or what the record quantity of sales was. The Government also introduced evidence that, on one occasion, other members of the night shift had a stash of drugs that included a quantity of methamphetamine. *See* Tr. at 362–63, 483-88; GX 317, 517, 1002. But no evidence was introduced to benchmark that quantity of drugs as ordinary, such that a jury could extrapolate from the quantity seized that day to a larger amount by any means other than surmise or speculation. Similarly, the only text exchange between the cooperating witness and Mr. Eusebio involving a distribution of E Pills did not include a quantity.

The evidence presented at trial does not support the finding that Mr. Eusebio was directly and personally involved in the sale of methamphetamine in Florida. The cooperating witness testified that he had sent "hundreds or thousands" of pills, including "ecstasy pills" to Mr. Eusebio in Miami in early 2022. The defendant was later arrested in Florida with 16 white pills marked as oxycodone and 50 peach pills marked as Adderall. Tr. at 1132:11-1133:13. The Government's argument that the jury could have found that the 50 peach pills were methamphetamine rests on a string of speculation.

The source of the deficiency in the Government's evidence is that it chose not to present at trial lab test results showing that the "Adderall" pills contained methamphetamine. Lacking that, the Government relies on an attenuated a chain of inferences which, it argues, could have led a rational jury to conclude that the 50 pills marked as Adderall were methamphetamine:

> The jury could have reasonably concluded that the 50 peach pills seized from the defendant in Miami were in fact methamphetamine based on, among other evidence, (i) Rodriguez's testimony that he sent the defendant "hundreds or thousands" of oxycodone and "ecstasy pills," (ii) the defendant's arrest in Miami in possession of a large quantity of pills, (iii) the defendant's girlfriend's statement to Rodriguez that pills sent from New York had been seized by Miami PD, (iv) the fact that all seized "ecstasy pills" in this case tested positive for methamphetamine, and (v) Inspector Hernandez's testimony that methamphetamine is frequently "pressed

16

> into pills either to replicate or counterfeit certain pharmaceutical pills," (Tr. 925). The jury could have further concluded, based on the ratio of those seized pills, that approximately 75% of the "hundreds or thousands" of pills the defendant had Rodriguez send to him in Florida contained methamphetamine. And because the jury was entitled to credit Rodriguez's testimony that up to "thousands" of pills were sent to Florida, the jury could have conservatively and reasonably concluded that this included at least 1,500 pills containing methamphetamine.

Opp. at 22-23.

This chain of inferences relies on speculation. The defendant correctly points to two basic problems with the Government's argument. First, the peach pills marked as Adderall did not resemble the E Pills marketed by the 174th Street Crew, which were designed to look like cartoon characters. The cooperating witness referred to transporting oxycodone and E Pills to Mr. Eusebio, not Adderall pills. Inspector Hernandez' generic testimony that methamphetamine is frequently pressed into pills to "replicate" pharmaceutical pills like Adderall, Tr. at 924:3-10, is not sufficient to support a finding of guilt beyond a reasonable doubt that these pills were methamphetamine.

Second, even if it did, the cooperating witness' testimony does not support the jury's finding of drug quantity. The witness testified that he sent Mr. Eusebio "hundreds or thousands" of pills. Tr. 443:13-14. To reach the required quantity of methamphetamine, the Government calculates that the witness must have sent Mr. Eusebio at least 1,750 pills—75% of 2,000 (the smallest number of "thousands"). The cooperating witness's testimony as to quantity was equivocal as to whether he sent hundreds *or* thousands of pills. Nor did the cooperating witness identify what percentage of the pills he sent were E Pills, as opposed to oxycodone. As a result, his testimony does not provide a basis "from which an approximation of the unknown quantities [could] logically be derived." *Pauling*, 924 F.3d at 657.

The Government's argument that Mr. Eusebio's leadership role in the conspiracy suffices to establish that he was "directly and personally" involved in all of his workers' sales effectively asks the Court to rewrite the governing standard. As described above, the Government argues that Mr.

17

Eusebio can be found to have participated "directly and personally" in the sales of any member of the conspiracy because he was one of the conspiracy's leaders. This is inconsistent with the requirement of "direct and personal" participation established by the Second Circuit in *Andino*. The requirement was satisfied in *Andino* because the defendant personally handled and transported a package of drugs, even though the defendant did not know what was in it. *See Andino*, 627 F.3d at 47.

The Second Circuit has held that the "direct and personal" participation requirement is not satisfied when the evidence shows only that a defendant has directed the conduct of another person. For example in *United States v. Culbertson*, the Second Circuit held that a defendant who had recruited another to transport drugs, but did not "actually handle" the drugs himself did not "directly and personally" engage in the drug transaction. 670 F.3d 183, 189, 191 (2d Cir. 2012). The condition was also not satisfied in *United States v. Adams*, 448 F.3d 492 (2d Cir. 2006), in which the defendant merely "recruited another individual to transport drugs on his behalf." *Andino*, 627 F.3d at 47 n.3. The holding of these cases do not support the conclusion that a defendant can be found to have been "directly and personally" involved in a drug transaction by another person merely because he organized the transaction. Nor do the words of the standard, which require "direct and personal" participation.

The Government does not cite to any cases that reach the conclusion that a leadership role in a conspiracy by itself establishes that the leader was "directly and personally" involved in all sales by the members of the conspiracy. The Government points to *United States v. Felder*, 214 F. Supp. 3d 220 (S.D.N.Y. 2016), which the Government describes as "denying Rule 29 motion raising challenge to the evidence as to the quantity of cocaine base involved in the charged conspiracy, in part, because of 'ample testimony from which the jury could have reasonably inferred that Felder was a leader of the [DTO] who would have had insight into the scope of its drug operation.'" Opp. at 17.

18

But the holding in *Felder* did not turn on whether the defendant was "directly and personally" involved in the sales. Instead, the court found that the defendant's leadership role supported the inference that the sales by the members of the conspiracy were reasonably foreseeable to him. *See Felder*, 214 F. Supp. 3d at 230 ("From all of this evidence, the jury could have inferred that it was reasonably foreseeable to Felder that 280 grams or more of crack cocaine would be possessed and distributed by the conspiracy."). Because the governing standard requires "direct and personal" participation by a defendant in a sale rather than "indirect and vicarious" participation, the argument that the Government need not prove *scienter* as to drug type and quantities with respect to all sales by his co-conspirators because he had a leadership role is unpersuasive.

Mr. Eusebio's leadership role in the conspiracy does not permit a rational jury to find beyond a reasonable doubt that he was "directly and personally" involved in all drug sales by his co-conspirators. The Government argues that the testimony that Mr. Eusebio, or his co-defendant Red, supplied drugs to the workers on the night shift can support the inference that he was directly and personally involved in the distribution of methamphetamine by members of the night shift. However, the evidence of sales of E Pills by the night shift introduced at trial is very limited, and does not support a finding that Mr. Eusebio was directly and personally involved in a large volume of sales. There was one seizure of methamphetamine from the night shift on the evening of December 8, 2021. But the Government's cooperating witness testified that Mr. Eusebio was not present that night. Tr. at 426:17-19. Additionally, while Mr. Eusebio said in a text message that he would send the cooperating witness E Pills, no evidence was introduced regarding the quantity of pills distributed. In the absence of other evidence, a rational jury could not find beyond a reasonable doubt that Mr. Eusebio was directly and personally involved in the sale of the quantity of methamphetamine found by the jury.

19

## IV.     CONCLUSION

For the foregoing reasons, the defendant's motion for partial acquittal is GRANTED as to the jury's finding that his Count One conspiracy to distribute illegally controlled substances involved 500 grams or more of methamphetamine. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 617.

SO ORDERED.

Dated: March 24, 2025
New York, New York

                                              GREGORY H. WOODS
                                              United States District Judge